**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51673-0-II |
| Respondent, | |
| v. | |
| PETER ABARCA, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. — Peter Abarca appeals his exceptional sentence and legal financial obligations (LFOs) following his guilty plea convictions for unlawful delivery of methamphetamine, unlawful possession of methamphetamine with intent to manufacture or deliver, and unlawful possession of a controlled substance (heroin) with intent to manufacture or deliver, each with the major violation of the Uniform Controlled Substances Act, ch. 69.50 RCW (VUCSA), aggravating factor. RCW 9.94A.535(3)(e).[1] We hold that (1) the trial court did not err when it imposed the exceptional sentence, (2) Abarca was not deprived of effective assistance of counsel by his attorney's decision not to seek an exceptional sentence below the standard range based on Abarca's youth, (3) under the recently amended LFO statutes, the imposition of a criminal filing fee and a nonrestitution interest provision is not authorized, (4) under the recently amended

---

[1] The legislature amended RCW 9.94A.535 in 2019. LAWS OF 2019, ch. 219, § 1. The 2019 amendment is not relevant to this appeal. Accordingly, we cite to the current version of the statute.

LFO statutes, the trial court properly imposed a deoxyribonucleic acid (DNA) collection fee, and (5) the community custody supervision assessment was properly imposed because it was not a cost subject to the recent amendments.

Accordingly, we affirm the exceptional sentence and the imposition of the DNA collection fee and community custody supervision assessment. But we remand to the trial court to strike the nonrestitution interest provision effective June 7, 2018 and to reassess whether to impose the remaining LFOs under the current law.[2]

FACTS

I.  ARREST, CHARGES, AND GUILTY PLEA

Following a drug investigation by the West Sound Narcotic Enforcement Team (WestNET) that culminated in a series of controlled buys, Abarca was arrested for his participation in two drug sales that he and his girlfriend, Yenilen Guzman, had engaged in in Kitsap County. Law enforcement confiscated at least 5.6 pounds of methamphetamine and .3 pounds of heroin during the controlled buys and a subsequent search of Guzman's vehicle.

The State charged Abarca by amended information with unlawful delivery of methamphetamine (count I), unlawful possession of methamphetamine with intent to manufacture or deliver (count II), and unlawful possession of a controlled substance (heroin) with intent to

---

[2] The trial court may also reconsider whether to impose the community custody supervision assessment in light of Abarca's ability to pay.

manufacture or deliver (count III).[3]  Count I was based on a controlled drug sale in June 2017;

Abarca was 19 years old at the time of this offense.  Counts II and III were based on the drug "buy

bust" operation that led to Guzman's arrest in mid-July; Abarca was 20 years old at the time of

these offenses.  Clerk's Papers (CP) at 7.  The State alleged that each offense was a major violation

of the VUCSA under RCW 9.94A.535(3)(e).

The certificate of probable cause supporting the charges stated,

During late June 2017, WestNET conducted a controlled buy from Yenilen Guzman. . . . .  With the use of a Police Operative, WestNET ordered methamphetamine directly from [Guzman].  [Guzman] transported the narcotics from the Los Angeles, CA area up to Kitsap County.
Special Agent [(SA)] Kilgallen was able to place video cameras in a hotel room in south Kitsap County without the use of any audio, and the [operative] arranged for the deal to happen there.  The [operative] held constant communication with [Guzman] and the deal occurred as planned.
[Guzman] arrived to the deal in a rental vehicle and carried a black bag with her, containing the meth.  The [operative] was previously searched as well as the hotel room, and the [operative] was handed a large amount of pre-recorded funds. ($8K)
[Guzman] brought a male with her, who was later identified as Peter Abarca. . . .
During the exchange, both [Guzman] and [Abarca] handled the meth and [Guzman] accepted the money and counted it right in the room.  Everything was captured on video.
[Kitsap County Sheriff's Detective Sean Kirkwood] later processed the evidence that weighed approximately 2 pounds with packaging and displayed (2) separate positive NIK test results.
On 7/12/17, WestNET conducted a buy bust operation from [Guzman].  WestNET ordered 7 pounds of meth and 4 ounces of heroin from [Guzman].  The [operative] spoke directly to and texted [Guzman] to arrange the deal.  On the day that [Guzman] arrived, the [operative] called her number to confirm arrangements and [Abarca] picked up [Guzman's] phone to speak directly to the [operative] regarding the details of the deal. I know this, because I was listening to the call with the [operative] and heard [Abarca] speak directly.

---

[3] The original charges were the same as the charges in the amended information except that count III in the original information was for possession of methamphetamine with intent to manufacture or deliver rather than heroin.  The amended information also added accomplice liability allegations to each charge.

When [Guzman] arrived to serve the drugs, [Guzman] informed the [operative] that she saw an unmarked police car in the driveway of the prearranged deal location which was the Days Inn located in south Kitsap County. [Guzman] and another female drove out of the area where a marked vehicle made a traffic stop approximately 1 mile up the road. [Guzman] and the female were subsequently taken into custody without a problem.

[Kirkwood] transported [Guzman] to the Kitsap County jail and Detective Manchester got a warrant to search the rental vehicle. During questioning, [Kirkwood] began by reading [Guzman] *Miranda*[4] warnings that she stated she understood. SA Kilgallen and [Kirkwood] were in an interview room with [Guzman]. [Kirkwood] showed [Guzman] pictures of her and [Abarca] doing the controlled buy and she admitted that it was them. [Guzman] admitted that [Abarca] was the one talking to the [operative] to arrange the deal safely for her. During that conversation, [Abarca] stated that he had a lot more "work" for the [operative] and that he had (2) kilos of cocaine on him right then at that time.

[Guzman] admitted that during the search warrant, we would find (5) pounds of meth and (5) ounces of heroin in the trunk of the rental vehicle and that she was here to sell it to the [operative].

[Guzman] also admitted that she was up here a third time, that we had not yet discussed with her.

The result of the buy bust search warrant, was as follows:

Approximately 5.6 pounds of meth with packaging

And approximately .3 pounds of heroin with packaging.

The meth was in 5 separate 1 pound bundles and the heroin was on [sic] 1 bundle. Each of said bundles was test[ed] and all of which showed presumptive positive NIK test results.

There is probable cause to charge [Guzman] and [Abarca] with the following:

VUCSA delivery of meth

VUCSA delivery of meth and heroin

The [operative] has also been told, that both [Guzman] and [Abarca] are planning to flee to Mexico. Currently WestNET has active pings on [Guzman's] phone from a previously obtained warrant and she is in the Los Angeles area preparing to leave.

CP at 7-8.

Abarca pleaded guilty to the amended charges and to the aggravating circumstances related to each charge. Rather than state in his own words what made him guilty of the crimes, he agreed that the trial court could "review the police reports and/or statement of probable cause

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

supplied by the prosecution to establish a factual basis for the plea."[5]  *Id.* at 62.  The amended plea

agreement[6] specified that the aggravating circumstances for each offense were that the offenses

were major violations of the VUCSA under RCW 9.94A.535(3)(e), but it did not specify which of

six possible factual grounds were the basis of the aggravating circumstances.  The trial court

accepted Abarca's guilty plea.

## II.  SENTENCING

### A.  KIRKWOOD'S TESTIMONY AND ABARCA'S ALLOCUTION

During the sentencing hearing,[7] the trial court heard testimony from Kirkwood.[8]

Kirkwood's testimony was consistent with the facts in the certificate of probable cause, but he

provided more detail.  Kirkwood had been investigating suspected drug dealer Robert Pacheco for

two years.  Pacheco was dating Guzman in mid-2016 through mid-2017, and she was involved in

his drug dealing activities.  After Guzman and Pacheco's relationship ended, Guzman decided to

develop her own drug operation using the connections she had developed while working for

Pacheco.  Guzman then became a "primary target" for WestNET.  Verbatim Report of Proceedings

(VRP) (Feb. 26, 2018) at 15.

---

[5] The police reports are not part of the record on appeal.

[6] The amended plea agreement was corrected to reflect an accurate offender score and accurate standard ranges for the charged offenses.

[7] Abarca and Guzman were sentenced at the same sentencing hearing.

[8] Abarca does not argue that the trial court erred in hearing this testimony or that it erred to the extent it relied on this testimony to support the exceptional sentence.

The police operative subsequently engaged in two controlled buys with Guzman in June 2017. Guzman conducted the first sale in the company of a man who was not Abarca. The other man purchased approximately 2.06 pounds of methamphetamine from Guzman and introduced the operative to Guzman. Kirkwood testified that the drugs purchased at the first controlled buy were packaged to avoid detection and that this type of packaging was rarely seen unless the sale involved "a high-level, sophisticated drug dealer." *Id.* at 18.

About two weeks later, the operative was able to purchase two more pounds of methamphetamine from Guzman. Abarca, who was now in a relationship with Guzman, accompanied Guzman to this sale. During this sale, Abarca unpackaged the methamphetamine so the operative could inspect and weigh it. This methamphetamine was packaged the same way as the previously purchased methamphetamine.

In July, Kirkwood attempted to conduct a "buy/bust" operation. *Id.* at 29. When Guzman arrived at the designated location, she thought saw an unmarked police car nearby. Guzman called the operative and told him about her concern. Either Guzman or the operative called Abarca, who was in California, and Guzman, Abarca, and the operative spoke to each other in a three-way call. During this call, Abarca told Guzman to drive away and "ditch" the drugs. *Id.* at 32.

Guzman drove away as directed, and law enforcement officers stopped her. The officers found approximately 5 pounds of methamphetamine and .3 pounds (135 to 136 grams) of heroin hidden inside the vehicle. After the officers interviewed her, Guzman agreed to work with law enforcement and was allowed to return to California.

As to Abarca's involvement in the last attempted sale, Kirkwood testified that Abarca was in a relationship with Guzman and that he was trying to provide security for her, but he

6

remained in California because he was on probation and was wearing an "ankle bracelet." *Id.* at 43. Kirkwood further noted that Abarca had also appeared to be negotiating the price with the operative during the last attempted sale.

Abarca later called Kirkwood. Ultimately, Abarca refused to talk to Kirkwood about his (Abarca's) involvement in the drug sale, refused to help Kirkwood in his investigations, and told Kirkwood that he and Guzman were going to Mexico. Abarca and Guzman were subsequently arrested in California.

In addition to testifying about the offenses, Kirkwood testified that a typical drug sale at this level in Kitsap County was about a quarter of a pound of methamphetamine and between one and two ounces of heroin and that he had never before seen this much methamphetamine in a "state-level case" in Kitsap County. *Id.* at 35. He also stated that the drugs were the best quality drugs he had seen locally.

Kirkwood opined that the seized methamphetamine would yield approximately 4,400 "servings" and that the seized heroin would yield 1,350 to 1,360 "servings." *Id.* at 38. He estimated that the total street value for both drugs was approximately $196,000. Kirkwood further testified that this was a sophisticated drug operation and that it posed a danger to the community.

After Kirkwood's testimony, the trial court allowed Abarca's mother and Abarca to speak to the court. Abarca's mother stated that Abarca was still a "kid," that he "doesn't think as a grown man," and that he was "easily influenced by older people." *Id.* at 95. Abarca stated that he took "full responsibility for [his] actions" and that he was "aware of what [he] was doing." *Id.* at 98. But he further stated that he thought that the State's recommended 180-month sentence was unfair.

7

B.  SENTENCING ARGUMENTS AND SENTENCING

The State argued for 120-month concurrent sentences for counts II and III to run consecutively to a 60-month sentence for count I, for a total sentence of 180 months.  The State asserted that this sentence was similar to the sentence Abarca would have received if this had been a federal offense.  It also argued that these offenses were "significan[t]" offenses due to the quantity of drugs and that this amount of drugs would have been damaging to the community.  *Id.* at 93.  Additionally, the State commented that "Abarca's youth just does not compensate for the level of operation and the amount of drugs that he was dealing to our community."  *Id.* at 94.

Defense counsel conceded that the offenses involved large amounts of drugs and stated that Abarca was willing to accept a sentence above the standard range.[9]  But defense counsel argued for a sentence of 20 months for each offense to run consecutively for a total sentence of 60 months.

Defense counsel further argued that the State's recommended 180-month sentence was excessive because it was nine times the top of the standard range for each offense and the equivalent to the sentence a defendant might receive if he or she was convicted of murder.  Defense counsel noted that Abarca had taken responsibility for his actions and that his involvement in the offenses was minimal, distinguishing Abarca from Pacheco, whom counsel characterized as a high-level drug dealer.

Although defense counsel stated that Abarca was not seeking a sentence below the standard range, she argued that the trial court should still consider Abarca's youth.  Apparently

---

[9] The standard sentencing range for each offense was "12+ to 20" months.  CP at 80.

referencing *State v. O'Dell*, 183 Wn.2d 680, 358 P.3d 359 (2015),[10] counsel noted that courts now recognize that the brains of young men Abarca's age are still developing and that these young men are "more susceptible to outside influences." VRP (Feb. 26, 2018) at 101-02.

The trial court stated that this case was "extraordinary" and noted that the amount of drugs at issue had the potential to damage the community. *Id.* at 117. The court also stated that although Abarca was young and easily influenced, he had a complete understanding of what he was doing when he committed these offenses and that he knew what he was doing was wrong. The court commented that even though the amount of drugs may not have been considered large in the grander scheme, Abarca and Guzman still brought "massive quantities of illegal substances" into the area, so an exceptional sentence was appropriate. *Id.* at 121.

The trial court imposed 60-month exceptional sentences on each count and ran the sentence for count I consecutive to counts II and III and counts II and III concurrently for a total term of confinement of 120 months. The court stated that the sentence took into consideration "whatever mitigating factors that may exist." *Id.*

The trial court subsequently entered written findings of fact and conclusions of law for the exceptional sentence. The court found that Abarca had pleaded guilty to the aggravating circumstances of a major violation of the VUSCA as charged in each count and that based on the certificate of probable cause, there was a factual basis for this plea. The court concluded that the

---

[10] In *O'Dell*, our Supreme Court held that a defendant's youthfulness can be a possible mitigating factor justifying an exceptional sentence below the standard range when the defendant was over 18 years old at the time of the offense. 183 Wn.2d at 696.

aggravating circumstances to which Abarca pleaded were "substantial and compelling reasons to impose [the] exceptional sentence." CP at 123.

Without any discussion of Abarca's financial situation, the trial court imposed LFOs including a criminal filing fee and a DNA collection fee and ordered that Abarca pay interest on all LFOs. As part of Abarca's community custody conditions, the court also required Abarca to pay a "[Department of Corrections] monthly supervision assessment." *Id.* at 85.

Abarca appeals his sentence.

## DISCUSSION

Abarca challenges his exceptional sentence and argues that he was deprived of effective assistance of counsel because his counsel did not request an exceptional sentence below the standard range based on his youth. He also challenges the criminal filing fee, the nonrestitution portion of the interest provision in the judgment and sentence, the DNA collection fee, and the community custody supervision assessment, arguing that these LFOs are no longer statutorily authorized.

### I. EXCEPTIONAL SENTENCE

Abarca first contends that the trial court's written findings supporting the exceptional sentence do not provide any reasoning that justifies the exceptional sentence. He also argues that the resulting exceptional sentence was clearly excessive. These arguments fail.

### A. PRINCIPLES OF LAW

The trial court may impose a sentence outside the standard range if there are "substantial and compelling reasons justifying an exceptional sentence" and the court sets forth the reasons for its decision in written findings of fact and conclusions of law. RCW 9.94A.535. RCW

9.94A.535(3) allows the trial court to impose an exceptional sentence if specific aggravating circumstances are stipulated to by the defendant. RCW 9.94A.537(3).

RCW 9.94A.535(3)(e) provides for the aggravating circumstance at issue here, a major violation of the VUSCA. RCW 9.94A.535(3)(e) provides,

> The current offense was a major violation of the [VUSCA], related to trafficking in controlled substances, which was more onerous than the typical offense of its statutory definition: The presence of ANY of the following may identify a current offense as a major VUCSA:
>     (i) The current offense involved at least three separate transactions in which controlled substances were sold, transferred, or possessed with intent to do so;
>     (ii) The current offense involved an attempted or actual sale or transfer of controlled substances in quantities substantially larger than for personal use;
>     (iii) The current offense involved the manufacture of controlled substances for use by other parties;
>     (iv) The circumstances of the current offense reveal the offender to have occupied a high position in the drug distribution hierarchy;
>     (v) The current offense involved a high degree of sophistication or planning, occurred over a lengthy period of time, or involved a broad geographic area of disbursement; or
>     (vi) The offender used his or her position or status to facilitate the commission of the current offense, including positions of trust, confidence or fiduciary responsibility (e.g., pharmacist, physician, or other medical professional).

If any one of the six enumerated factual alternatives is present, an exceptional sentence is justified. *State v. Solberg*, 122 Wn.2d 688, 707, 861 P.2d 460 (1993).

We review an exceptional sentence under RCW 9.94A.585(4), which provides,

> To reverse a sentence which is outside the standard sentence range, the reviewing court must find: (a) Either that the reasons supplied by the sentencing court are not supported by the record which was before the judge or that those reasons do not justify a sentence outside the standard sentence range for that offense; or (b) that the sentence imposed was clearly excessive or clearly too lenient.

RCW 9.94A.585(4)(a) includes both a factual and a legal component. *State v. Stubbs*, 170 Wn.2d 117, 123, 240 P.3d 143 (2010). Generally, we review the factual component, whether the trial court's reasons are supported by the record, for sufficiency of the evidence. We review the

11

legal component of the sentence, whether these reasons justify the exceptional sentence, de novo. *Id*. at 124. And we review whether an exceptional sentence is clearly excessive for abuse of discretion. *State v. Souther*, 100 Wn. App. 701, 721, 998 P.2d 350 (2000).

B. ADEQUATE FACTUAL FINDINGS

Abarca contends that the trial court failed to make the required factual determination because it did not specify in its written findings of fact which of the six enumerated factual grounds in RCW 9.94A.535(3)(e) it relied on. We disagree.

RCW 9.94A.537(3) allows the facts justifying an exceptional sentence to be determined in any one of three ways: proven to a jury beyond a reasonable doubt, found by the court beyond a reasonable doubt if jury is waived, or stipulation to the aggravating facts. Here, Abarca pleaded guilty to the aggravating factor, and this plea is the equivalent of a stipulation to the aggravating factor. *In re Pers. Restraint of Reise*, 146 Wn. App. 772, 782, 192 P.3d 949 (2008) ("a defendant who pleads guilty admits factual and legal guilt for the charged crime"). Given the plea, the trial court was not required to enter additional findings of fact supporting the aggravating factors.

Furthermore, although Abarca is correct that the trial court did not make findings regarding which of the six alternative factual grounds listed in RCW 9.94A.535(3)(e) it was relying on, Abarca fails to cite authority requiring the trial court make a factual finding as to the exact ground supporting the aggravating factor when the defendant has pleaded guilty to the aggravating factor. None of the cases he cites in his argument address whether written findings specifying the facts establishing the aggravating factor are required when the trial court imposes an exceptional

sentence based on a plea to the aggravating factor.[11]  Accordingly, Abarca fails to establish that the trial court was required to make findings establishing which of the six factual grounds established the major violation aggravating factor and this argument fails.

C.  ADEQUATE LEGAL JUSTIFICATION

Abarca further argues that the trial court's written findings do not "justify the exceptional sentence" because the findings "do not describe how the aggravating circumstances were 'substantial and compelling' or how the aggravator justified an exceptional sentence."  Opening Br. of Appellant at 13.  This argument relates to the legal component of the sentence—whether the reasons justify the exceptional sentence.  Thus, our review of this issue is de novo.  *Stubbs*, 170 Wn.2d at 124.

RCW 9.94A.535 provides that "[t]he court may impose a sentence outside the standard range for an offense if it finds, considering the purpose of this chapter, that there are substantial and compelling reasons justifying an exceptional sentence."  Abarca's plea to the aggravating factor necessarily admitted that his offenses were major violations of the VUSCA.  Under RCW 9.94A.535(3)(e), an offense is a major violation of the VUSCA when the offense is "more onerous than the typical offense of its statutory definition."  The fact the offenses for which Abarca was convicted were by definition "more onerous than the typical offense," provides an ample basis for the trial court to conclude that there was a substantial and compelling reason to distinguish this

---

[11] *See State v. Friedlund*, 182 Wn.2d 388, 390-92, 341 P.3d 280 (2015); *State v. Pappas*, 176 Wn.2d 188, 190-91, 289 P.3d 634 (2012); *Stubbs*, 170 Wn.2d at 122; *Solberg*, 122 Wn.2d at 702-05; *State v. France*, 176 Wn. App. 463, 469, 308 P.3d 812 (2013); *State v. Hrycenko*, 85 Wn. App. 543, 546, 933 P.2d 435 (1997), *abrogated in part on other grounds by State v. Gonzales Flores*, 164 Wn.2d 1, 186 P.3d 1038 (2008).

offense from others in the same category. RCW 9.94A.535(3)(e). Accordingly, this argument fails.

D. LENGTH OF SENTENCE

Abarca next argues that the 120-month sentence, which was six times the 20-month high-end standard range sentence for each offense, was excessive given Abarca's age at the time of the offenses, his limited role as an accomplice in each offense, and his secondary role in the alleged drug operation. We disagree.

The trial court has broad discretion to determine the appropriate length of an exceptional sentence when substantial and compelling reasons are present. *State v. Knutz*, 161 Wn. App. 395, 410, 253 P.3d 437 (2011). And we have "considerable latitude" when assessing whether a sentence is clearly excessive. *State v. Halsey*, 140 Wn. App. 313, 325, 165 P.3d 409 (2007).

A sentence is clearly excessive if (1) it is "clearly unreasonable," i.e., was based on untenable grounds or untenable reasons or (2) it was based on proper reasons, but its length "'shocks the conscience'" in light of the record. *Knutz*, 161 Wn. App. at 410-11 (internal quotation marks omitted) (quoting *State v. Kolesnik*, 146 Wn. App. 790, 805, 192 P.3d 937 (2008)). A sentence "shocks the conscience" if no reasonable person would have adopted it. *Id.* at 411. Abarca does not argue that the sentence was based on untenable grounds or untenable reasons, so we address only whether the length of the sentence "shocks the conscience." *Id.*

The trial court imposed 60-month sentences on each offense, so the sentence for each offense was three times the top of the 20-month standard range for the offenses. It then ran count I consecutive to the concurrent sentences on counts II and III, resulting in a 120-month sentence. The 120-month a sentence is six times the length of the top of the standard range for each individual

offense. Although Abarca contends that the 120-month sentence is excessive in light of the nature of Abarca's involvement in the drug sales and other factors, he does not argue that this sentence "shocks the conscience" in light of this record. And given that the amount of methamphetamine involved in these offenses was the most Detective Kirkwood had ever seen in a "state-level case" and the drugs would yield a total of more than 5,700 "servings," with potentially damaging consequences to the community, we cannot conclude that the 120-month sentence "shocks the conscience." VRP (Feb. 26, 2018) at 35, 38.

Given that the trial court has "'all but unbridled discretion in setting the length of the sentence,'" we conclude that the trial court's exceptional sentence does not "'shock the conscience,'" especially in light of the egregious nature of the case. *Knutz*, 161 Wn. App. at 411 (internal quotation marks omitted) (quoting *Halsey*, 140 Wn. App. at 325). Accordingly, this argument fails, and we affirm the exceptional sentence.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Abarca next argues that he was deprived of effective assistance of counsel when defense counsel elected not to argue for an exceptional sentence downward under *O'Dell*. Again, we disagree.

The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. *State v. Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011) (citing *Strickland v. Washington*, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To establish ineffective assistance of counsel, Abarca must show, based on the record on appeal, that (1) defense counsel's conduct was deficient and (2) the deficient

performance resulted in prejudice. *Id.* at 32-33. Abarca fails to establish deficient performance or prejudice.

A.  REASONABLE TACTICAL DECISION

Defense counsel's "performance is deficient if it falls 'below an objective standard of reasonableness.'" *Id.* at 33 (quoting *Strickland*, 466 U.S. at 688). "[A] defendant alleging ineffective assistance must overcome 'a strong presumption that counsel's performance was reasonable.'" *Id.* (quoting *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). If counsel's actions "'can be characterized as legitimate trial strategy or tactics, performance is not deficient.'" *Id.* (quoting *Kyllo*, 166 Wn.2d at 862). "Conversely, a criminal defendant can rebut the presumption of reasonable performance by demonstrating that 'there is no conceivable legitimate tactic explaining counsel's performance.'" *Id.* (quoting *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004)); *see also In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017).

Here, deciding to not seek an exceptional sentence downward was a reasonable tactical decision because Abarca stipulated to an aggravating factor. In light of Abarca's stipulation, arguing for an exceptional sentence downward based on his youth would have been entirely inconsistent with Abarca's stipulation to the aggravating factor and could have been viewed as unreasonable. By not seeking an exceptional sentence downward and instead arguing for an aggravated sentence closer to the standard range based on Abarca's youth, defense counsel was pursuing a more reasonable argument that the trial court was more likely to consider and preserving her and Abarca's credibility. Because this tactic was reasonable, Abarca does not establish deficient performance.

B. NO PREJUDICE

Furthermore, even presuming that defense counsel's performance was deficient, her choice not to argue for an exceptional sentence downward would not have been prejudicial.

"To satisfy the prejudice prong of the *Strickland* test, [Abarca] must establish that 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" *Grier*, 171 Wn.2d at 34 (quoting *Kyllo*, 166 Wn.2d at 862). Here, although defense counsel did not argue for a sentence below the standard range based on Abarca's youth, she successfully argued for a sentence substantially lower than the State's recommended sentence based, at least in part, on Abarca's youth. The trial court was well aware of Abarca's youth, yet it still imposed an exceptional sentence above the standard range. Given that the trial court imposed a sentence above the standard range despite knowing of the mitigating factor of Abarca's youth, there is no reasonable probability that the trial court would have imposed a sentence below the standard range had defense counsel argued for such a sentence. Thus, even presuming that defense counsel should have argued for an exceptional sentence downward, Abarca fails to establish that defense counsel's failure to argue for a sentence below the standard range was prejudicial. Accordingly, Abarca's ineffective assistance of counsel claim fails.

III. LFOs

Abarca next argues that under the recent changes to the LFO statutes and *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), we should strike the criminal filing fee, the nonrestitution interest on LFOs provision, the DNA collection fee, and the community custody supervision assessment. He also contends that the trial court did not make an adequate, individualized inquiry into his ability to pay before imposing any discretionary costs as required under RCW 10.01.160.

The State concedes that the criminal filing fee, the interest provision, and the community custody supervision assessment should be stricken. But it argues that the trial court properly imposed the DNA collection fee because Abarca has never had his DNA collected in this state.

We affirm the imposition of the DNA collection fee and the community custody supervision assessment, but we remand to the trial court to strike the interest provision on nonrestitution LFOs and to reassess whether to impose the remaining costs under the current law and after fully evaluating Abarca's ability to pay. On remand, the trial court may also reconsider whether to impose the discretionary community custody supervision assessment.

A. CRIMINAL FILING FEE

The trial court imposed a filing fee. RCW 36.18.020(2)(h) now provides that the trial court cannot impose the filing fee if the defendant is indigent as defined in RCW 10.101.010(3)(a) through (c). This version of the statute applies to Abarca. *Ramirez*, 191 Wn.2d at 747.

Although the superior court found Abarca indigent, the record does not show that it found him indigent under RCW 10.101.010(3)(a) through (c) rather than subsection (d). Accordingly, remand to the superior court to determine whether Abarca is indigent under RCW 10.101.010(3)(a) through (c) is required.

B. NONRESTITUTION INTEREST PROVISION

The sentencing court also imposed interest on the nonrestitution LFOs from the date of judgment, February 26, 2018. But RCW 10.82.090(1) now provides that as of June 7, 2018, "no interest shall accrue on non-restitution [LFOs]." Again, the amended version of RCW 10.82.090(1) applies to Abarca. *Ramirez*, 191 Wn.2d at 747. Because the statute now prohibits interest on nonrestitution LFOs "[a]s of June 7, 2018," the interest provision in the judgment and

sentence, to the extent it applies to nonrestitution LFOs after June 7, 2018, must be struck. RCW 10.82.090(1).

C. DNA COLLECTION FEE

Abarca further argues that under the recently amended statutes, the trial court could not impose the DNA collection fee because he previously had DNA collected in California following his convictions in that state. We disagree.

RCW 43.43.7541 now provides that "[e]very sentence imposed for a crime specified in RCW 43.43.754[12] must include a fee of one hundred dollars unless *the state* has previously collected the offender's DNA as a result of a prior conviction." (Emphasis added.) The plain language of RCW 43.43.7541 requires that to waive the DNA collection fee, "the state" must have previously collected the offender's DNA; it does not provide that the DNA fee can be waived if another state has previously collected the offender's DNA. Because Abarca has never had his DNA collected in this state, the trial court did not err when it imposed the DNA collection fee.

D. COMMUNITY CUSTODY SUPERVISION ASSESSMENT

As part of his supervision schedule, the trial court ordered Abarca to "[p]ay [a Department of Corrections (DOC)] monthly supervision assessment." CP at 85. Abarca argues that this requirement was a discretionary "cost" imposed under RCW 9.94A.703(2)(d)[13] and that he is not required to pay this discretionary "cost" under RCW 10.01.160(3) because he is indigent and because the trial court did not make an adequate inquiry into his ability to pay. Although the

---

[12] RCW 43.43.754(1) requires a DNA sample if the offender has been convicted of a felony.

[13] The legislature amended RCW 9.94A.703 in 2018. LAWS OF 2018, ch. 201, § 9004. Because this amendment did not change the subsection at issue here, we cite to the current version of the statute.

waivable community custody supervision assessment is discretionary, it is not a cost. Thus, RCW 10.01.160(3) does not apply, and the trial court is not required to inquire into Abarca's ability to pay before imposing the supervision assessment.

RCW 10.01.160(3) now provides that the trial court shall not order a defendant to pay *costs* if a defendant is indigent as defined in RCW 10.101.010(3)(a) through (c). Similarly, RCW 9.94A.760(1) now provides that the trial court cannot order "costs" as described in RCW 10.01.160 if the defendant is indigent as defined in RCW 10.101.010(3)(a) through (c). RCW 10.01.160(2) defines "costs" as follows: "Costs shall be limited to expenses specially incurred by the state in prosecuting the defendant or in administering the deferred prosecution program under chapter 10.05 RCW or pretrial supervision."

The community custody supervision assessment was imposed under RCW 9.94A.703(2)(d), which states, "Unless waived by the court, as part of any term of community custody, the court shall order an offender to . . . [p]ay supervision fees as determined by the DOC." The community custody supervision assessment is a discretionary LFO. *State v. Lundstrom*, 6 Wn. App. 2d 388, 396 n.3, 429 P.3d 1116 (2018), *review denied*, 193 Wn.2d 1007 (2019). But the fact that the community custody supervision assessment is a discretionary LFO does not make the assessment a "cost" within the meaning of RCW 10.01.160(3). A community custody supervision assessment clearly does not meet the definition of a cost under RCW 10.01.160(2) because it is not an expense specially incurred by the State to prosecute the defendant, to administer a deferred prosecution program, or to administer pretrial supervision. Because the community custody supervision assessment is not a cost, the trial court was not required to conduct an inquiry into

Abarca's ability to pay under RCW 10.01.160(2). *See State v. Clark*, 191 Wn. App. 369, 374-75, 362 P.3d 309 (2015) (distinguishing fines from costs).

Accordingly, we decline to accept the State's concession as to the community custody supervision assessment. But since we are remanding for reconsideration of other LFOs in light of Abarca's financial status, we do not restrict the trial court from reconsidering the imposition of this discretionary assessment as well.

As Division Three of this court noted in *Clark*, there are strong policy arguments that favor the consideration of the defendant's ability to pay discretionary LFOs even when such consideration is not required. *Id.* at 376. In addressing whether the trial court had to consider the defendant's ability to pay a fine that was not a "cost" within the meaning of RCW 10.01.160(2), the court stated,

> [W]e strongly urge trial judges to consider the defendant's ability to pay before imposing fines. The barriers that LFOs impose on an offender's reintegration to society are well documented in *Blazina* and should not be imposed lightly merely because the legislature has not dictated that judges conduct the same inquiry required for discretionary costs.

*Clark*, 191 Wn. App. at 376. We agree that this important policy should be broadly supported. Thus, on remand, although the trial court is not required to reevaluate imposing the community custody supervision assessment in light of Abarca's ability to pay, the trial court is encouraged to do so.

CONCLUSION

We affirm Abarca's exceptional sentence, the DNA collection fee, and the community custody supervision fee. But we remand to the trial court to strike the nonrestitution interest provision effective June 7, 2018 and to reassess whether to impose the remaining costs under the

current law.  In addition, the trial court can reconsider whether to impose the community custody supervision assessment based on Abarca's ability to pay.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

WORSWICK, J.

LEE, A.C.J.